IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TYRONE CLARK

CRIMINAL ACTION FILE NO.

1:16-CR-427-AT-JKL-5

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

This Order and Report and Recommendation addresses the following
motions filed by Defendant Tyrone Clark:

–   Motion to Suppress Search of Defendant's Automobile on November
    4, 2016 [Doc. 597];

–   Motion for Bill of Particulars [Doc. 600]; and

–   Motion to Suppress Statements and Request for *Jackson v. Denno*
    Hearing [Doc. 839].

On October 24, 2018, I held an evidentiary hearing on the motion to suppress
relating to the automobile.  [Doc. 812 (transcript of hearing).]  After the hearing,
the government responded to the motion [Doc. 830], and Clark filed a reply [Doc.
843].  The parties have also provided, at the Court's request, supplemental briefing

regarding the motion.  [Docs. 983, 992.]  The government has also filed a response to the motion for a bill of particulars [Doc. 763], with respect to which Clark has not filed a reply.  On February 28, 2019, I held an evidentiary hearing on the motion to suppress statements.  [Doc. 913 (transcript of hearing).]  Clark has filed a post-hearing brief in support of the motion to suppress statements [Doc. 944], and the government has filed a response [Doc. 972].

In Part One of this Report and Recommendation, the Court summarizes the charges against Clark.  In Part Two, the Court addresses Clark's motion for a bill of particulars.  Next, in Part Three, the Court addresses Clark's motion to suppress evidence seized at the November 4, 2016 traffic stop.  Finally, in Part Four, the Court addresses Clark's motion to suppress statements he made during a forty-minute interview with law enforcement.   For the following reasons, it is **ORDERED** that the motion for a bill of particulars be **DENIED**, and it is **RECOMMENDED** that Clark's motion to suppress evidence seized in connection with the traffic stop be **GRANTED IN PART AND DENIED IN PART** and Clark's motion to suppress statements be **GRANTED IN PART AND DENIED IN PART**.

## I.   SUMMARY OF CHARGES AGAINST CLARK

Clark is charged in this case with the federal crimes of Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy (Count 1); attempted Violent Crimes in Aid of Racketeering Activity ("VICAR") murder (Count 2); two counts of VICAR murder conspiracy (Counts 3 and 7), conspiracy to distribute controlled substances (Count 8); and possession of methamphetamine with intent to distribute (Count 12).  [Doc. 33 (Superseding Indictment).]  In Count One, the superseding indictment alleges that Clark was a member of the Nine Trey Gangsters, a street gang with members in New York, Georgia, and other southeastern states.  [*Id.* at 3-4, 14.]  The gang allegedly traces its origins to the United Blood Nation, a gang alliance that formed at Rikers Island in New York in the early 1990s that is also loosely affiliated with the Bloods gang of Los Angeles.  [*Id.* at 3.]  The superseding indictment alleges that the Nine Trey Gangsters operated as a racketeering enterprise as defined by 18 U.S.C. § 1961(4).  [*Id.* at 12.]

As to Clark's personal participation in the RICO conspiracy, the superseding indictment alleges that he was involved in efforts to murder persons suspected of disrespecting fellow gang members.  Allegedly, on or about February 13, 2016, Clark and codefendants Khajavius Mitchell, Joseph Riley, Westley Shivers, and Jimmy Rosser, on the orders of codefendant Gary Sartor, attempted to kill V.P. by

shooting him multiple times in retaliation for disrespecting Sartor (Overt Act 7). [Doc. 33 at 20.]  Later, on or about September 26, 2016, Clark and codefendants Riley and Michael Jackson arranged for others to go to the house of a rival gang member to recover money and kill persons who had pointed guns at a Nine Trey Gangsters member earlier that day (Overt Act 95).  [*Id.* at 34-35.]  Also on September 26, 2016, Sartor allegedly confirmed to Clark that he (Sartor) had ordered the murder of a fellow gang member (Overt Act 99).  [*Id.* at 35.]

The superseding indictment also alleges that Clark was involved in gang meetings and that he held a position of a leadership within the gang.  On February 13, 2016, the date of the alleged attempted murder of V.P., Clark, Mitchell, Rosser, and Shivers allegedly attended a gang meeting in Adams Park in Atlanta, Georgia (Overt Act 8).  [Doc. 33 at 20.]  Two days later, during an alleged gang meeting conducted by conference call, codefendant Gordon Evans, who allegedly outranked Clark, told Clark, Sartor, and co-defendant Patrick Caple that they "are responsible for the actions of the others underneath you" (Overt Act 9).  [*Id.*]  On August 27, 2016, Clark and other alleged gang members Mitchell, Brandon Asberry, Raekwon Williams, J'mon Hawkins, Calmetrius Dawkins, and others allegedly attended a gang meeting (Overt Act 35).  [*Id.* at 24.]   Allegedly, Clark and Asberry

4

participated in a September 8, 2016 phone call during which the collection of members' dues money was discussed (Overt Act 42).  [*Id.* at 25-26.]  On September 19, 2016, Clark, Riley, Mitchell, and other gang members allegedly discussed participating in a drive-by shooting for money, and Mitchell and another gang member allegedly agreed to carry out the shooting (Overt Act 67).  [*Id.* at 29-30.]  On October 5, 2016, an inmate at Smith State Prison contacted Clark to vet a Nine Trey Gangster gang member (Overt Act 107).  [*Id.* at 36.]

The superseding indictment also alleges that Clark was involved with maintaining the "Billy Spot," a northwest Atlanta apartment where Nine Trey Gangsters members allegedly stored contraband and held meetings.  [Doc. 30 at 21 (defining "Billy Spot").]  In or about July 15, 2016 and August 9, 2016, Clark allegedly paid utility bills for the Billy Spot (Overt Acts 15, 20).  [Doc. 33 at 22.]  On or about August 5, 2016, Clark allegedly asked S.C. to help him get in touch with high ranking gang member M.M. so that M.M. would provide rent money for the Billy Spot, and S.C. agreed to have M.M. send the money (Overt Act 18).  [*Id.* at 22.]  On or about September 24, 2016, Clark attended a meeting with other Nine Trey Gangster members at the Billy Spot, including codefendants Mitchell, Riley, Williams, Kierra Maheia, Alfonzo Nalls, Asberry, Tashied Reed, and Rosser

(Overt Act 87).  [*Id.* at 33.]  Mitchell and Williams were subsequently arrested, and on September 25 and 26, 2016, Clark, Sartor, Nalls, and Maheia "collaborated to remove all contraband, including drugs and drug proceeds, from the 'Billy Spot,' to avoid detection and confiscation of the drugs and money by law enforcement" (Overt Act 91). [*Id.* at 34.]

Clark is also alleged to have had extensive involvement in drug trafficking in furtherance of gang activities.  The superseding indictment alleges as follows:

- Around August 4, 2016, Clark told codefendant Brandon Asberry to call a gang leader about acquiring heroin (Overt Act 17).  [Doc. 33 at 22.]

- On August 17, 2016, Clark allegedly complained to codefendant Demario Ridley about marijuana that Ridley had supplied to him (Overt Act 29).  [Doc. 33 at 23.]

- On August 22, 2016, Clark and codefendant Joseph Riley allegedly sold 1000 Xanax pills to codefendant Earl Smiley (Overt Act 30).  [Doc. 33 at 24.]

- From August 24, 2016 through August 30, 2016, Clark allegedly acquired heroin from a Nine Trey Gangster associate, which he then

6

sold to gang member J.W. for distribution (Overt Act 31). [Doc. 33 at 24.]

- On August 27, 2016, Smiley allegedly wired $500 to Clark via Western Union to pay a portion of a drug debt that Smiley owed Clark (Overt Act 33). [Doc. 33 at 24.] Allegedly, Smiley sent his full name to Clark so that Clark could pick up the Western Union transfer (Overt Act 34). [*Id.*]

- On September 8, 2016, Clark, Joseph Riley, and Demario Ridley possessed Xanax pills for distribution (Overt Act 37). [Doc. 33 at 25.]

- On September 9, 2016, a higher-ranking gang member, M.M., instructed Clark to kill Smiley for his failure to pay Clark for the Xanax pills, and M.M. offered to supply Clark with a gun or to arrange for the killing by a lower-ranking gang member (Overt Act 43). [Doc. 33 at 26.] Also on that day, Clark allegedly discussed tasking Mitchell with killing Smiley, and Mitchell stated that he would be willing to carry out the murder (Overt Act 44). [*Id.*] That day, Clark, Mitchell, and other gang members also participated in a gang meeting via telephone (Overt Act 45). [*Id.*]

- On September 15, 2016, Clark allegedly sent a text to Smiley regarding Smiley's unpaid drug debt, stating "this is not the Billy way" (Overt Act 56). [Doc. 33 at 28.]

- On September 16, 2016, Clark allegedly obtained drugs for distribution from Travis Todd and Demario Ridley (Overt Act 57). [Doc. 33 at 28.]

- On September 22, 2016, Clark allegedly sold oxycodone pills (Overt Act 78). [Doc. 33 at 31.]

- Allegedly, on September 22, 2016, S.C. told Clark that he was going to New Jersey to get in good standing with "NTG Godfather P.G.",[1] and S.C. asked Clark about the appropriate price for methamphetamine that S.C. was planning to distribute while in the New Jersey/New York area (Overt Act 82). [Doc. 33 at 32.]

---

[1] The superseding indictment alleges that the "Godfather" is a national leadership position over all "lines" or groups of Nine Trey Gangsters, and likely also has authority over other lines affiliated with the United Blood Nation. [*See* Doc. 33 at 4.]

8

- On September 27, 2016, Clark and Michael Jackson allegedly discussed having narcotics delivered to a corrections officer at Dodge State Prison (Overt Act 101).  [Doc. 33 at 36.]

- Around October 1, 2016, Clark, Cedrick Hill and Erick Balcazar allegedly supplied Sartor and Riley with methamphetamine for distribution (Overt Act 102).  [Doc. 33 at 36].

- Allegedly, on October 3, 2016, S.C. told Clark that he had just gotten off the phone with NTG Godfather P.G. (Overt Act 104).  [Doc. 33 at 36.]   That same day, S.C. sold Clark marijuana that S.C. had previously purchased from Mitchell, which S.C. had been unable to sell (Overt Act 105).  [*Id.* at 36.]

- The next day, Clark allegedly sold Percocet and marijuana to Blood member C.H. for distribution (Overt Act 106).  [Doc. 33 at 36.]

- On October 5, 2016, following Mitchell's arrest, S.C. and Clark discussed introducing Mitchell's marijuana supplier to S.C. for the purpose of continuing the supply of marijuana to members of the gang (Overt Act 108).  [Doc. 33 at 36-37.]

9

- On November 4, 2016, Clark, Hill, and Balcazar allegedly provided four kilograms of methamphetamine to Riley on behalf of Sartor (Overt Act 116).[2] [Doc. 33 at 38.]  On that same day, Clark allegedly possessed a .45 caliber pistol and $5,538 cash (Overt Act 118).  [*Id.*]

- On November 25, 2016, while in possession of firearms, Tashied Reed and another Nine Trey Gangster member traveled to South Carolina to collect a drug debt owed to Clark from Earl Smiley (Overt Act 131). [Doc. 33 at 40.]

The attempted VICAR murder charge in Count 2 and the associated VICAR murder conspiracy charge in Count 3 are based on Clark's alleged conduct on February 12 and 13, 2016, when he and others (including Mitchell, Riley, Sartor, Rosser, and Shivers) allegedly conspired and attempted to murder V.P., for the purpose of maintaining and increasing position in the Nine Trey Gangsters.  [Doc. 33 at 43-44.]  The VICAR conspiracy charge in Count 7 is based on Clark's alleged conduct on September 26, 2016, when he and other Nine Trey Gangster members

---

[2] Clark's alleged conduct on November 4, 2016 also forms the basis of Count 12, the possession of methamphetamine with intent to distribute charge.

conspired to murder members of a rival gang for the purpose of maintaining and increasing position within the Nine Trey Gangsters.  [*Id.* at 46.]

## II.    MOTION FOR BILL OF PARTICULARS

In his motion for bill of particulars, Clark argues that he is entitled to the following information:

1) With respect to Count One, the RICO conspiracy count:

   a. The identity of V.P. identified in Overt Act 7

   b. Detail concerning the conference call referenced in Overt Act 9 and Evans's purported statement that the gang's leaders are responsible for persons under them, including the source of the statement, the purpose of the call, whether the call was made in connection with any criminal event or scheme, the basis for inferring that Clark was a leader, and the nature or scope of his authority.

   c. The identity of persons identified by their initials in Overt Acts 17, 18, 31, 43, 82, 95, 99, 104, 105, 106, and 108.

   d. The person to whom Clark allegedly sold oxycodone pills, as alleged in Overt Act 78.

11

    e.  The identity of the inmate at Smith State Prison who allegedly contacted Clark to vet a Nine Trey Gangster member, as alleged in Overt Act 107.

    f.  Detail on how possession of a firearm and cash furthers the alleged conspiracy, as alleged in Overt Act 118.

2)  Regarding Count Two, the attempted murder charge:

    a.  The identification of V.P.

    b.  The manner in which the attempted murder was commissioned and how it "fell short."

    c.  Clark's alleged role in the attempted murder.

    d.  How the alleged attempted murder facilitated or promoted Clark's maintaining or increasing his stature within the gang.

3)  Regarding Count Three, the conspiracy to commit murder:

    a.  The identification of V.P.

    b.  How Clark's stature would be enhanced by the alleged conspiracy.

    c.  The nature of any agreement.

4)  Regarding Count Eight, which alleges conspiracy to possess with intent to distribute controlled substances:

a. The particular drugs that Clark "is specifically alleged to be connected to."

b. The specific dates he was involved in the alleged conspiracy.

[Doc. 600 at 3-6.]

The government responds that Clark's motion is an impermissible attempt to compel the government to disclose its theory of the case, the evidence it intends to use at trial, and the identities of witnesses it intends to call at trial. [Doc. 763 at 3-7.] The government also points out that, as to the RICO conspiracy charge, it is not required to prove any overt acts. [*Id.* at 3-4.] Regarding Clark's specific requests, the government states that it has produced material in discovery from which the identities of individuals referred to by their initials in the indictment can be surmised. [*Id.* at 4.] The government also directs Clark to intercepted calls with respect to his requests for information about the overt acts, the attempted VICAR murder charge, and the VICAR murder conspiracy charge. [*Id.* at 4-6.] For Overt Act 118, the government also states that its theory is that, on November 4, 2016, Clark possessed a pistol and cash in furtherance of the alleged RICO conspiracy because he possessed those items as he was leaving a drug deal involving other gang members and leaders, and he possessed those items in furtherance of the drug

13

deal.  [*Id.* at 6.]  Also, as to Clark's request for additional detail about the conspiracy to distribute drugs charge, the government refers Clark to conduct alleged in specific overt acts and to intercepted calls.  [*Id.* at 7.]  The government further states that it intends to elicit testimony at trial concerning Clark's alleged involvement in drug distribution with other Nine Trey Gangster members.  [*Id.*]

Federal Rule of Criminal Procedure 7(f) authorizes the Court to direct the government to file a bill of particulars.  "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense."  *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir.) (quotation omitted), *cert. denied*, 138 S. Ct. 379 (2017).  General discovery is not a valid reason for seeking a bill of particulars, *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981), nor is it "'designed to compel the government to [provide a] detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial,'" *United States v. Roberts*, 174 F. App'x 475, 477 (11th Cir. 2006) (quoting *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980)).  Further, "the defendant [is not] entitled to a bill of particulars with respect to information which is already

14

available through other sources such as the indictment or discovery and inspection." *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir.), *modified on other grounds by*, 801 F.2d 378 (11th Cir. 1986). "The defendant bears the burden of showing that the information requested is necessary and that he will be prejudiced without it so as to justify granting a bill of particulars," and as a result, the "mere statement that the defendant will be prejudiced . . . is insufficient." *United States v. Reddy*, No. 1:09-CR-0483-ODE-AJB, 2010 WL 3210842, at *5 (N.D. Ga. Apr. 5, 2010) (citing *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998)), *report and recommendation adopted in relevant part*, 2010 WL 3211029 (N.D. Ga. Aug. 11, 2010); *see also United States v. Blitch*, No. 5:08-CR-40(HL), 2009 WL 973359, at *5 (M.D. Ga. Apr. 9, 2009) (citing *United States v. Thevis*, 474 F. Supp. 117, 124 (N.D. Ga. 1979)). The grant or denial of a bill of particulars rests within the sound discretion of the trial court. *United States v. Draine*, 811 F.2d 1419, 1421 (11th Cir. 1987); *Colson*, 662 F.2d at 1391.

Clark's requests relating to Count One are due to be denied for the principal reason that each request seeks information about Clark's alleged overt acts. Overt acts are not elements of a RICO conspiracy, however. *See Salinas v. United States*, 522 U.S. 52, 64 (1997) ("The RICO conspiracy statute, § 1962(d), broadened

15

conspiracy coverage by omitting the requirement of an overt act . . . .").  As such, detail regarding overt acts is unsuitable for a bill of particulars.  *United States v. Henley*, No. 1:16-cr-151-LMM-JFK, 2017 WL 2952821, at *16 (N.D. Ga. May 19, 2017) (denying motion for bill of particulars seeking details concerning overt acts taken in furtherance of extortion and drug conspiracies), *report and recommendation adopted*, 2017 WL 2918954 (N.D. Ga. July 7, 2017); *United States v. Goldenshtein*, No. 1:10-cr-323-TCB-RGV, 2011 WL 1321573, at *13 (N.D. Ga. Feb. 22, 2011) (noting, in a drug conspiracy case, that "[a] bill of particulars cannot be used to ferret out additional overt acts not listed in the indictment, as long as the indictment alleges the required number of overt acts under the statute being charged"), *report and recommendation adopted*, 2011 WL 1257147 (N.D. Ga. Apr. 1, 2011); *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *15 (N.D. Ga. June 12, 2007) ("Case law is also clear that the Government is not required to identify . . . specific acts or overt acts done in furtherance of a charged conspiracy by particular defendants.").  Even so, the Court is persuaded that based on the government's response to Clark's motion for a bill of particulars and the discovery produced in this case, Clark can determine much of the detail that he seeks concerning his alleged illegal conduct.  Similarly,

16

Clark's requests for further information relating to Counts Two, Three, and Eight are due to be denied as the discovery and the government's response to Clark's motion provide sufficient information to enable Clark to avoid surprise at trial and identify what the government alleges he did to violate the law.

In sum, the operative indictment in this case provides Clark with enough information to allow him to prepare his defenses, minimize surprise at trial, and enable him to plead double jeopardy if later prosecuted for the same offense. Accordingly, the motion for a bill of particulars [Doc. 600] is **DENIED**.

## III.   MOTION TO SUPPRESS EVIDENCE SEIZED IN CONNECTION WITH THE NOVEMBER 4, 2016 TRAFFIC STOP

Clark moves to suppress currency and a firearm that law enforcement seized following a traffic stop on November 4, 2016, in Cobb County, Georgia.  The seizure of those items forms the basis of Overt Act 118, which alleges that on November 4, 2016, he possessed a .45 caliber pistol and $5,538 in cash.  [Doc. 33 at 38.]

### A.   Facts

On the evening of November 4, 2016, Lt. John Cronin with the Georgia State Patrol was asked by law enforcement partners to stop a black Infiniti believed to be

17

driven by Clark.[3]  [Doc. 812 at 2, 7-8, 25.]  Lt. Cronin first observed the Infiniti

traveling along James Jackson Parkway in Atlanta, Fulton County, Georgia, as it

was being followed by two Atlanta Police Department ("APD") patrol vehicles.

[*Id.* at 17-18.]  Lt. Cronin fell behind the APD vehicles, and as the Infiniti crossed

into Cobb County, the APD vehicles stopped following the car, leaving Lt. Cronin

immediately behind the Infiniti.  [*Id.* at 7, 18.]  He paced the Infiniti for about half

a mile and determined that it was traveling at 58 miles per hour, 13 miles per hour

over the posted speed limit of 45.[4]  [*Id.* at 7-8, 33.]  Lt. Cronin activated his

emergency lights, but the Infiniti continued to travel at the same speed, passing

several closed businesses and a side road and eventually stopping at an entrance

ramp for I-285.  [*Id.* at 8.]  Concerned that the Infiniti might flee, Lt. Cronin

positioned his cruiser in front of the Infiniti to prevent it from continuing onto the

---

[3] At the time of the traffic stop Lt. Cronin was a Post Commander with the Georgia State Patrol's DUI Task Force, also known as the "Nighthawks."  [Doc. 812 at 3, 8.]  The Court concludes, based on the hearing testimony that Lt. Cronin was with the Nighthawks and Lt. Cronin's testimony that he worked nights, that the traffic stop at issue here occurred in the evening.  [*See id.* at 13.]

[4] "Pacing is when a police officer uses his or her own speedometer to determine the speed of the suspect's vehicle."  *United States v. Peguero*, 518 F. App'x 792, 794 (11th Cir. 2013).

expressway.   Another state trooper who had joined behind Lt. Cronin positioned his vehicle behind the Infiniti.  [*Id.*]

Lt. Cronin got out of his cruiser and approached the Infiniti from the front. [Doc. 812 at 9.]  Noticing that the driver, ultimately identified as Clark, appeared to be focused on the center console area, Lt. Cronin unholstered his gun and ordered Clark to show his hands and exit the vehicle.  Clark complied.  Lt. Cronin then holstered his weapon and advised Clark that he had stopped him for speeding. Clark responded that he would not have been speeding because he knew that there were police cars behind him.  [*Id.*]

Lt. Cronin then returned to his cruiser and ran Clark's driver's license, which revealed that he had an outstanding warrant from the Georgia State Board of Pardons and Paroles.  [Doc. 812 at 10.]  Lt. Cronin informed Clark that he would be detained pending confirmation of the warrant.  [*Id.* at 10-11.]  Lt. Cronin handcuffed Clark and, before placing Clark in his patrol vehicle, checked his pockets for weapons.  [*Id.*]  He found none, but he did locate and remove a "large bundle of money" in Clark's left pocket and "some money" in Clark's wallet.  [*Id.* at 11.]  The bundle of money was "so large" that Lt. Cronin could not feel anything else in Clark's pocket.  [*Id.* at 34.]  Lt. Cronin testified that he searched the wallet

because it was "bulging."  [*Id.*]  At that time, he did not seize any of the money as evidence; he instead returned the items to Clark's pocket.  [*Id.* at 33.]  Lt. Cronin then placed Clark into his patrol vehicle.  [*Id.*at 11.]

Lt. Cronin then received confirmation of the warrant, and the agency that entered the warrant requested that a hold be placed on Clark.  [Doc. 812 at 11.]  At that point, Lt. Cronin proceeded as though Clark was under arrest.  He decided to impound the Infiniti, pursuant to the Georgia Department of Public Safety Policy of Removing Vehicles.  [*Id.* at 11-12; *see also* Doc. 809 at 3-6 (policy).]  Another Georgia State Patrol officer who had also arrived at the scene conducted an inventory search of the car and located a Springfield Armory model XD handgun in the passenger glove compartment.  [Doc. 812 at 11.]  A serial number check revealed that the gun had been reported stolen.  [*Id.*]  Furthermore, APD officers arrived at the scene of the traffic stop after the arrested warrant was confirmed, and Clark's money was turned over to them as evidence.  [*Id.* at 34.]

During the traffic stop, Lt. Cronin also determined that the Infiniti was owned by Clark's girlfriend.  [Doc. 812 at 14-15.]  None of the law enforcement officers made an effort to contact Clark's girlfriend to retrieve the car, however.  [*Id.* at 15.]  Ultimately, the car was towed from the scene.  [*Id.* at 14.]

20

B.     **Analysis**

1.     **Probable Cause Existed to Support the Traffic Stop**

A traffic stop is constitutional if it is based upon probable cause to believe that a traffic violation occurred, even if law enforcement's real motivation is suspicion of other criminal activity. *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). "When determining whether an officer had probable cause to believe that a traffic violation occurred, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." *Harris*, 526 F.3d at 1337 (quotation omitted).

Clark argues that the only evidence supporting probable cause is Lt. Cronin's testimony, which lacks credibility and, therefore, probable cause did not exist to conduct the traffic stop. [Doc. 843 at 1.] Clark points to the lack of corroborating evidence, such as a video of the traffic stop or a certified copy of a Clark's speeding conviction, and maintains that it strains credulity that Clark was speeding because neither of the APD officers who had been following him in Atlanta stopped him there. [*Id.* at 1-3.] The Court disagrees.

Based on Lt. Cronin's testimony, which the Court credits, he had probable cause to stop the Infiniti for speeding. A law enforcement officer may

21

constitutionally establish probable cause to stop a vehicle for speeding based on the officer's firsthand observation, based on pacing, that a vehicle is traveling in excess of the posted speed limit. *See Peguero*, 518 F. App'x at 794 (officer used pacing to develop probable cause that defendant was speeding); *United States v. Rowls*, 402 F. App'x 467, 468 (11th Cir. 2010) (same). Lt. Cronin credibly testified that he paced Clark traveling at 58 mph in a 45-mph zone. Under the circumstances of this case, the lack of a video or a copy of a conviction does not undermine or even call into question Lt. Cronin's credibility. Likewise, whether or not Clark was speeding in Atlanta before crossing into Cobb County is immaterial. Lt. Cronin testified that he developed probable cause based on his own observations when he was following immediately behind Clark. In short, Clark has not presented sufficient evidence to refute Lt. Cronin's testimony that Clark was traveling at a speed in excess of the posted speed limit or to suggest that Lt. Cronin's hearing testimony was untruthful. Accordingly, crediting Lt. Cronin's testimony, the Court finds that probable cause existed to conduct the traffic stop.

Clark also argues that the traffic stop was unconstitutional because Lt. Cronin had been asked by another law enforcement agency to stop Clark's vehicle, and, therefore, the stop was pretextual. [Doc. 843 at 3.] *Whren* forecloses this

argument.  In determining whether probable cause exists, the Court must determine whether from an objective standpoint, Lt. Cronin was justified in making the traffic stop.  As just explained, Lt. Cronin had probable cause to stop Clark for speeding, and his subjective intentions do not invalidate the stop under the Fourth Amendment.

For these reasons, then, the Court finds that Lt. Cronin had probable cause to stop the Infiniti.

>   **2.   The Frisk and Temporary Removal of Items from Clark's Pockets Were Not Unconstitutional, but Lt. Cronin's Search of the Wallet Was Unconstitutional**

Clark next argues that the cash seized following the traffic stop should be suppressed because, by removing Clark's wallet and cash from his clothing, Lt. Cronin exceeded the permissible scope of the pat-down.  [Doc. 843 at 4.]  More specifically, Clark contends that a pat-down is limited to finding contraband or weapons, and that neither the wallet nor bundle of cash that Lt. Cronin removed from his pockets were contraband or weapons.  [Doc. 992 at 2.]  "When an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he believes may be weapons or other instruments of assault."  *United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)), *petition for cert.*

*docketed*, No. 18-9399 (May 23, 2019).  "To frisk a suspect, an officer 'conduct[s] a carefully limited search of the outer clothing [of the suspect] . . . to discovery weapons which might be used to assault him.'"  *Id.* (alterations in original) (quoting *Terry*, 392 U.S. at 30).  If the officer "feels a concealed object that he reasonably believes may be a weapon, he may continue the search beyond the outer clothing 'by searching [the suspect's] pocket' and removing the concealed object."  *Id.* (alteration in original) (quoting *United States v. Clay*, 483 F.3d 739 (11th Cir. 2007)).  The scope of a frisk must be carefully limited to serve the protection of the police officer and others nearby, "but it must not be so limited that officers cannot take other reasonable actions in furtherance of their own safety and that of others." *Johnson*, 921 at 1000 (holding that officer may properly remove ammunition from suspect's pocket "when the removal is reasonably related to the protection of the officers and others nearby").  In determining the reasonableness of the officer's belief, the Court, considering the totality of the circumstances, asks "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *Id.* at 998 (quoting *Terry*, 392 U.S. at 27).

Here, Lt. Cronin's decision to conduct a pat-down was justified because he had a reasonable belief that Clark posed a danger to his safety and the safety of others.  Lt. Cronin did not know much about why APD wanted Clark stopped, except that a gang or violent crime task force was involved, but he knew that he was not making a routine traffic stop.  [Doc. 812 at 26.]  After Lt. Cronin activated his emergency lights, Clark did not immediately stop but instead travelled past closed business and a side road, eventually stopping the entrance of an expressway.  [*Id.* at 8-9.]  The traffic stop occurred at night, and upon exiting his cruiser, Lt. Cronin observed that Clark was focused on the center console area of the car.[5]  [*Id.* at 9.]  Then, after running Clark's driver's license, Lt. Cronin learned that there was an outstanding warrant for a possible parole violation.  [*Id.* at 10.]

As for the scope of the pat-down, the Court finds that it was reasonable for Lt. Cronin to remove the wallet and cash from Clark's pockets, as they were

_____

[5] Lt. Cronin testified that he approached the Infiniti with his gun drawn because he was concerned for his safety:  "So when I see a driver, that's part of my training, when I see someone in a vehicle that's reaching into an area that I can't see, in our training we're told that it's the hand of someone that will kill us.  So [as] you're approaching if you see someone reaching into an area and [you] can't see what their hands are doing, then . . . I'm going to unholster my weapon because just in basic life you know that action is quicker than reaction."  [Doc. 812 at 27-28.]

obstructing his ability to feel for weapons.  Lt. Cronin testified credibly at the evidentiary hearing that Clark's wallet and the wad of cash in his pockets were bulging.  The money was "so large [that he] couldn't feel anything else in [Clark's] pocket."  [Doc. 812 at 34.]  What's more, after Lt. Cronin had removed the wallet and cash, he returned them to Clark, which further underscores that the purpose of removing them from his pockets was to ensure that bulging wallet or wad of cash was not obscuring a weapon otherwise concealed in his pockets.  For these reasons, then, the Court finds that Lt. Cronin's temporary removal of the large wad of cash and bulging wallet were reasonable under the circumstances to protect him and others from physical harm.  *See United States v. Zambrano*, 752 F. App'x 775, 783-84 (11th Cir. 2018) (officer reasonably removed wallet, keys, and four cell phones from suspect's pockets during a pat-down and then examined them further with the suspect's consent), *cert. denied*, 139 S. Ct. 1222 (2019); *United States v. Bailey*, 743 F.3d 322 (2d Cir. 2014) (observing that it was reasonable for officers to remove a wallet and keys from a suspect's pockets during a weapons pat-down, where the wallet was given back right away and the keys were retained to prevent the suspect's departure).

26

But Lt. Cronin took the additional step of searching the wallet during the pat-down. He testified that there was "some money, U.S. currency in his wallet" and when asked why he ***searched*** the wallet, he responded that it was "bulging." [Doc. 812 at 11, 34.] The Court is not aware of any of any authority allowing an officer to search a wallet seized from a suspect's pockets during a *Terry* stop, absent a warrant, consent, or another applicable exception to the warrant requirement. Even if such a search were permissible under *Terry*, the Court cannot conclude, from the record in this case, that Lt. Cronin searched the wallet based on a reasonable belief that it contained a weapon. Lt. Cronin did not offer any explanation for his search of the wallet except that it was bulging. *See Johnson*, 921 F.3d at 997; *see also King v. United States*, 917 F.3d 409, 427-29 (6th Cir. 2019) (rejecting an argument that the seizure of a wallet was reasonable during a *Terry* stop based on the officer's awareness of small or "artfully concealed" weapons).

In sum, under the circumstances, Lt. Cronin had a reasonable belief that Clark had a weapon and was justified both in conducting a pat-down and briefly removing items from Clark's pockets to determine whether they were obscuring a weapon. Lt. Cronin exceeded what is permissible under *Terry*, however, when he searched inside the wallet. Thus, the money found within the wallet should be

27

suppressed as the fruits of an unconstitutional warrantless search.  The Court is somewhat reluctant to recommend suppression of the money found in the wallet where it appears that an exception to the exclusionary rule may apply, such as that the wallet was inevitably seized incident to arrest once Clark was arrested on the parole violation warrant.  *See Nix v. Williams*, 467 U.S. 431 (1984).  It is up to the government, however, to establish by a preponderance of the evidence that evidence discovered unconstitutionally would have ultimately been recovered by lawful means.  *See United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007).  The government had an opportunity to supplement its brief on the question of the "warrantless search" of the cash [Doc. 976], and it did not make any argument about the inevitable discovery doctrine at that time.[6]  The Court cannot now make that argument for the government.

---

[6] In its supplemental brief, the government argues that the cash in the wallet was lawfully seized incident to Clark's arrest.  [Doc. 983 at 3.]  "The Supreme Court has indicated that '[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification.'"  *United States v. Thompson*, 244 F. App'x 926, 927 (11th Cir. 2007) (alteration in original) (quoting *Sibron v. New York*, 392 U.S. 40, 63 (1968)).  "Nonetheless, where the search of the person is followed quickly by a formal arrest supported by probable cause, the Supreme Court has stated that it does not 'believe it particularly important that the search preceded the arrest rather than vice versa.'"  *Id.* (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)).  Here, Lt. Cronin testified that that he ***searched*** the wallet during the pat-down [*see* Doc. Doc. 812 at 34], which, the government concedes,

### 3. The Search of the Infiniti Was Constitutional Under the Inventory Search Doctrine

Clark next challenges the lawfulness of the warrantless search of the Infiniti following his arrest. [Doc. 843 at 4-5.] The government argues that the search was lawful because Lt. Cronin properly impounded the vehicle and conducted an inventory search. [Doc. 830 at 8-9.] The government has the better of the arguments.

The Supreme Court has held that inventories conducted pursuant to an established procedure on legally impounded vehicles may be valid under the Fourth Amendment, even without a warrant. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976). "In order to utilize this exception to the warrant requirement, the government has the burden to show first that the police possessed the authority to impound the vehicle, and then that the officers followed the procedures outlined in the departmental policy in conducting the search." *United States v. Vladeff*, 630 F. App'x 998, 1000 (11th Cir.

---

occurred *before* Defendant was placed under arrest. While a pre-arrest search may be lawful as incident to arrest, the record is unclear how much time elapsed between the search of the wallet and the arrest, and, in any event, the government, which bears the burden to establish the lawfulness of a warrantless search, does not offer any argument in that regard.

2015) (citing *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991)). "[T]he critical question . . . is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason." *Id.* (alterations in original) (quoting *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992)).

Turning first to Lt. Cronin's decision to impound the Infiniti, Clark argues that it was not necessary to impound the vehicle because law enforcement officers could have contacted the car's owner, Clark's girlfriend, to retrieve the car. [Doc. 843 at 4.]   According to Defendant, "the police could with little effort have contacted the car's owner," but chose not to because "the stop was merely a ruse to conduct the search." [*Id.* at 4-5.]

The Court disagrees, as the evidence establishes that Lt. Cronin acted in accordance with Georgia Department of Public Safety policy and that his decision to impound the car rather than arrange for Clark's girlfriend to pick it up was "within the realm of reason."  The policy states, in pertinent part:

> In order to safeguard property and provide for the safety of the public, it shall be the policy of the Georgia Department of Public

> Safety to remove abandoned and unattended vehicles from the roadways of this state, when the owner cannot or will not provide for such removal.

[Doc. 809 at 3.] The term "unattended vehicles" includes any vehicle that has been left on a "[p]ublic street, road, highway, or other public property, and poses a threat to public health or safety." The policy instructs that if a vehicle is left unattended in a roadway, an officer should "immediately attempt to contact the driver/owner and/or have the vehicle removed." [*Id.*]

Here, Clark was pulled over at the entrance of an interstate onramp and was arrested. He was the sole occupant of the car and, because he had been arrested, was in no position to remove the car himself. Although the Georgia Department of Public Safety Manual permits a law enforcement officer to attempt to contact the owner of an unattended vehicle, it does not require the officer to do so. [Doc. 809 at 3.] Rather, the policy gives the officer discretion either to contact the driver/owner or to proceed with removal of the vehicle. Lt. Cronin testified that he understood he had discretion to decide whether to impound a vehicle, and that "vehicles shouldn't be towed as a punishment" but rather "to secure the vehicle." [Doc. 812 at 13.] He also testified that, in his experience, it is not practical to contact the owner of the car and stand by for him or her to pick it up, especially at night, because the person retrieving an unattended vehicle must be sober and

31

licensed, there must be a second person who is sober and licensed who can get that person to the scene, and the person tends to show up later than expected if at all. [*Id.* at 13-14, 16-17.]  Based on this testimony, which the Court finds credible, the Court finds that Lt. Cronin's decision not to offer an alternative to impoundment was not unreasonable under the circumstances, was consistent with of the written policy, and did not demonstrate that his motive was to search the car for evidence. *See Bertine*, 479 U.S. at 374 ("The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative less intrusive means.") (quotation omitted).

Having determined that the impoundment of the vehicle was authorized and reasonable under the circumstances of this case, the Court next addresses whether the inventory search was constitutional.  "The Supreme Court identified three distinct interests that justify the inventory search of a car upon impoundment: (1) the protection of the owner's property while it remains in police custody; (2) the protection the police against claims or disputes over lost or stolen property; and (3) the protection of the police from potential danger."  *United States v. Handy*, 592 F. App'x 893, 906 (11th Cir. 2015) (citing *Opperman*, 428 U.S. at 369).  Consistent with those interests, the Georgia Department of Public Safety Policy Manual states

that the "sole purpose" of conducting an inventory of an impounded vehicle is to safeguard personal property or public safety.  [Doc. 809 at 5.]  The policy further provides that an inventory "**shall** be conducted" when a driver or owner of a vehicle is arrested and the arrest involuntarily separates him or her from the vehicle, unless the vehicle is released to another authorized individual.  [*Id.*]  Lt. Cronin testified that if a vehicle is removed from the scene as part of an impound, the officer is required to conduct an inventory "to protect all parties involved, the driver, the owner, the wrecker driver and the officers."  [Doc. 812 at 12-13.]

Clark's assertion that the traffic stop was pretextual and a ruse to conduct a search of the Infiniti is not persuasive.  [Doc. 843 at 4-5.]  "[T]he mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search." *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982).  Thus, regardless of whether Lt. Cronin expected to find contraband in the vehicle, his decision to impound and inventory the car was consistent with the Georgia Department of Public Safety Policy Manual.  Accordingly, the Court finds that the seizure of the firearm from the Infiniti was conducted pursuant to a valid inventory search.

### C.    Summary

For the foregoing reasons, the Court finds that Lt. Cronin lawfully stopped Clark's vehicle because there was probable cause to believe that Clark had

33

committed a driving offense; that the pat-down search of Clark prior to his being placed in the back of a police vehicle was lawful, including the brief removal of items from Clark's pockets; that Lt. Cronin's search of the wallet was not lawful; and that law enforcement lawfully seized the firearm from the Infiniti pursuant to a proper inventory search.  Thus, the only evidence that should be suppressed is the money found in the wallet.

Accordingly, it is **RECOMMENDED** that Clark's motion to suppress [Doc. 597] be **GRANTED IN PART AND DENIED IN PART**.

## IV.   MOTION TO SUPPRESS STATEMENTS

Clark moves to suppress statements that he made to law enforcement agents during an interview that took place on October 19, 2017, while he was in state custody at the Georgia Diagnostic and Classification Prison in Jackson, Georgia. [Doc. 944.]  Clark maintains that he was in custody at the time of the interview and that he did not voluntarily waive his right to remain silent or his right to counsel.

### A.   Facts[7]

On October 19, 2017, FBI TFO Joshua Thompson, FBI SA Paul Szabo, and FBI SA Jason Cleary interviewed Clark at the Georgia Diagnostic and

---

[7] The summary that follows is based on the hearing testimony of Task Force Officer ("TFO") Joshua Thompson and the audio recording of the interview of

Classification Prison in Jackson, Georgia, where Clark was incarcerated.  [Doc. 913 at 8-9, 21.]  The interview was conducted in a hearing room used for parole board hearings.  [*Id.*at 8.]

Clark was brought into to the hearing room in handcuffs and leg shackles because he had been transferred from the "high max" section of the prison, and the standard operating procedures for the prison require inmates to be restrained while moving through the facility.  [Doc. 913 at 10-11.]  Clark remained restrained during the interview under Georgia Department of Corrections rules.  [*Id.* at 11.]  He was not, however, handcuffed to the table.  [*Id.* at 19.]

Clark was placed in a seat at the end of a table.  [Doc. 913 at 11.]  SA Szabo sat immediately to Clark's left, and TFO Thompson to the left of SA Szabo.  SA Cleary sat to the right of Clark.  Clark was in his standard prison uniform, which was neatly pressed and cleaned.  He did not appear to be under the influence of alcohol or drugs, he was alert and able to focus, and he appeared to interact with

---

Clark, which was admitted into evidence as Government's Exhibit 1.  [*See* Doc. 930-1.]  The audio recording—which is approximately forty minutes long— captures the entirety of the interview.  [Doc. 913 at 9.]  The parties did not provide a transcript of the interview, so when referring to particular portions of the interview, the Court refers as best as possible to the elapsed time according to the software program that the Court used to listen to the recording.

35

law enforcement in a contextually appropriate manner.  [*Id.*]  He also did not appear to be suffering from any mental or physical ailments that would have caused him difficulty understanding what was being said.  [*Id.* at 11-12.]

At the beginning of the interview, the agents identified themselves and showed their credentials.  [Doc. 913 at 12.]  SA Szabo asked Clark if he knew why he was brought to the agents, and Clark responded that he did not.  (Gov't Ex. 1 at 0:12-0:14.)  SA Szabo explained that he had been charged in a 22-count federal indictment with a "RICO violation."  (*Id.* at 0:18-0:24.)  SA Szabo asked Clark if he knew what RICO is, and Clark responded by asking whether it was gang-related.  (*Id.* at 0:25-0:28.)  SA Szabo responded that it was, (*id.* at 0:29), and told Clark "that's the reason you've been brought up here" and that Clark would be appearing in federal court the following week (*id.* at 0:32-0:36).  SA Szabo then told Clark that "the reason we are actually sitting here today is because this has been a really long investigation . . . and we would actually like to talk to you about some of the stuff going on."  (*Id.* at 0:38-0:49.)  SA Szabo continued:  "Specifically the reason we want to talk to you is because we know a lot about you and we know a lot about the activities going on and we think you can help us, ok?"  (*Id.* at 0:49-1:00.)  At that point, another agent, presumably SA Cleary, interjected:  "And help yourself

in the process." (*Id.* at 1:01-1:03.) SA Szabo immediately added: "help yourself in the process. (*Id.* at 1:02-1:04.)

SA Szabo then went on to summarize the charges in the superseding indictment in this case and some of the information that law enforcement had learned during the course of the investigation. (Gov't Ex. 1 at 1:05-1:54.) SA Szabo then said: "I would like to talk to you. Are you willing to sit down and talk to us about the case and about the stuff and about everything?" (*Id.* at 1:54-2:00.) Rather than respond directly to the question, Clark replied: "What am I charged with?" (*Id.* at 2:01-2:02.) SA Szabo explained that Clark was charged with RICO, and explained generally what the charge involves. (*Id.* at 2:02-2:24.) Clark asked whether he was being charged just because he was "Billy" (presumably meaning because he was allegedly a member of the gang), and in response SA Szabo stated, no, it was "a lot more than that." (*Id.* at 2:24-2:30.) TFO Thompson added that Clark was being charged, in part, because he held the position of "Fifth Floor"—a position of leadership within the gang. (*Id.* at 2:32-36.)

SA Szabo explained that "this was a wiretap case" and that Clark's communications were intercepted. (Gov't Ex. 1 at 2:49.) SA Szabo explained that Clark had "painted [him]self in a hole" and there was "a whole series of crimes that

37

[he was] intercepted doing" and that people "got arrested" carrying out those crimes. (*Id.* at 2:59-3:14.)  SA Szabo also told Clark that he was being charged with all the crimes in the conspiracy, including crimes that were committed under his leadership and crimes that he "directly arranged or participated in." (*Id.* at 3:19-3:28.)  SA Szabo stated:  "The reason we are here is that we know how intricately you were involved in everything" and the agents "listened to your calls for a long long long time." (*Id.* at 3:32-3:41.)

SA Szabo told Clark: "I want to ask you questions about crimes that were committed by the gang, ok?  Crimes that you are intimately aware of, ok?  What I'm asking you is if you're willing to do that." (Gov't Ex. 1 at 4:12-22.)  SA Szabo then said: "I do need to advise you of your rights because we are in here.  But you can tell me right now if you willing to do that or not." (*Id.* at 4:24-4:30.)  Then TFO Thompson added:  "And even as we start talking if he says something that you don't want to talk about, you don't have to answer it.  But for us to answer — you might have some questions you want to know a little bit more about what we know, we're willing to talk about it but, we have to do it this way." (*Id.* at 4:30-4:50.)

At around the five-minute mark, SA Szabo told Clark, "Because you're in here, I'm required to read you your rights" and asked Clark to follow along with him as he read from a preprinted *Miranda* advice-of-rights and waiver-of-rights form.  (Gov't Ex. 1. 4:59-5:40.)  [Doc. 913 at 12-13; *see also* Gov't Ex. 2 [Doc. 930-2] (FBI advice of rights and consent form).]  SA Szabo reiterated that if at any time Clark wanted to stop, he had "every right to do so."  (Gov't Ex. 1 5:40-5:46.)  Clark did not sign the form or explicitly state that he was agreeing to waive his *Miranda* rights.  [Doc. 913 at 13, 16, 27.]  Rather, Clark responded by asking about the charges, stating:  "I don't get the part where you say that RICO is a charge.  I understand that, but don't charges fall under it?"  (Gov't Ex. 1 5:49-5:57.)  In response, the agents directed Clark to the indictment and told him to read the names of the codefendants.  (*Id.* at 5:59-6:02.)  SA Szabo explained:  "Let me tell you something about the FBI.  We do our homework.  It may take us a long time to get where we're getting, but we do our homework and we button it up.  That's how we're charging thirty people."  (*Id.* at 6:23-6:36.)  SA Szabo added:  "The other thing I need to explain to you about how indictments normally work, you really don't want [your name] to be close to the top.  Where's your name?"  (*Id.* at 6:49-6:58.)  Clark acknowledged that his name is "close to the top."  (*Id.* at 6:58-7:00.)

The agents told Clark that others have identified Clark as the "Number Five," the "Fifth Floor" or the "Street Sweeper." (*Id.* at 7:15-7:23.)

At approximately seven-and-a-half minutes into the interview, SA Szabo explained to Clark that he is in a unique position because he was "involved in almost . . . every single aspect of the case." (Gov't Ex. 1 at 7:24-7:33.) SA Szabo stated: "If you want to help yourself out you . . . have a card to play in that regard because we believe you can help us out significantly." (*Id.* at 7:39-7:49.) The interview continued:

> **SA Szabo**: I don't need it. I already have a 30-person indictment. But I know where you fit in the mix. I know what you have in that head. I know what you've seen. I know what you know about these different people. I know what you can tell me about these people. There's very few people that are in that position. You happen to be one of them. So I won't lie to you. We're here to pitch you to see if you're willing to help us.
>
> **SA Cleary**: And yourself.
>
> **TFO Thompson**: You're looking at life.
>
> **Clark**: Life?
>
> **TFO Thompson**: Life. That's . . . what's . . . called the guideline range. The fed system is different that the state. There's no parole. ***Basically the only way to help yourself out of life is to talk to us***. If not . . . there's nothing…there's no movement.

(*Id.* at 7:50-8:39 (emphasis added).)

40

Immediately after TFO Thompson insinuated that Clark would face a life sentence unless he spoke to the agents, SA Cleary asked Clark whether his youngest child had turned a year-and-a-half yet.  (Gov't Ex. 1 at 8:43-8:56.)  Clark acknowledged that the child has just turned sixteen months.  (*Id.* at 8:57.)  The agents then told Clark that they were aware that, at some point during the investigation, Clark had left the child with someone while he traveled to Miami and that the child had been in the back seat of Clark's car.  (*Id.* at 9:00-9:08.)  SA Cleary then stated, "Just something to think about."  (*Id.* at 9:09.)  Immediately following that statement, SA Szabo gave examples of "funny stuff" that they learned during the investigation, including an incident where a fellow gang member, identified as "Lil Yo" ran over a wedding party when his brakes failed and another incident where the agents overheard "Monto" shoot his toe off with a gun while arguing with a woman at the Billy Spot.  (*Id.* at 9:12-9:30.)  SA Szabo also asked Clark if he was aware that "Blow's spot got hit" the day before and that the FBI had rounded up defendants charged in the superseding indictment.  (*Id.* at 9:54-10:05.)  Clark then said:

> I know that Monto got his toe shot; I didn't know he shot his own toe.  See, y'all know what up more than I do.  You know, me being the five that's a true statement, but there's some stuff that I can't help you with I don't know . . . I don't know everything.

41

(*Id.* at 10:06-10:20.)

SA Szabo then said:  "Do you want to sit and talk to us for a little bit?  Alls I'm asking is for you to sign [the *Miranda* waiver form].  Do you understand the rights that I've read to you?"  (Gov't Ex. 1 at 10:23-29.)  Clark responded "Yeah" (*Id.* at 10:30.)   Over  the  next  several  minutes,  the  agents  explained  what information they were able to obtain during their investigation.

At around sixteen minutes into the interview, SA Szabo said:

> Here's the issue Tyrone.  When we're done here, you're going to go back out and I don't know how many days it is—two, three, four days—you're going to end up in federal court along with several other people.  . . . .  You are in an advantageous position because we know everything that you are a part of.  You have information that can be very helpful to us.  And in turn, you can use that to help yourself out.  I won't lie, they're serious charges and in the fed system they don't go away.  But you're going to need to do whatever you can to help yourself in this situation.

> I can't make you any promises.  But the first person I'll talk to when I leave here is the prosecutor who's handling this case, and he's going to say "How did it go?"  And I'm going to tell him one thing or another.  You are right smack in the middle of everything.  If you choose to, you can be very helpful to us.  And in turn that can be very helpful to you.  . . . .  You have an opportunity.  . . . .  You need to think of yourself, you need to think of your family, before you think of any of that, because you know what, everyone else in here is sunk too.  And if you don't think people at the top here . . . are going to take that opportunity in the fed system, you're kidding yourself.

(*Id.* at 16:23-18:17.)

The agents and Clark continued to speak about, among other things, the extensiveness of the government's investigation into the alleged gang activity. Approximately the 27 minutes into the interview, SA Szabo and Clark had the following exchange:

> **SA Szabo**:  Do you want to help yourself out of this a little bit?
>
> **Clark**:  I don't know.  If telling you something is a way to help myself out, I can't do that.
>
> **SA Szabo**:  Are you willing to answer our questions?
>
> **Clark**:  No, not if it's going to incriminate me.  That's what I'm saying.  I don't have anything to tell you.

(Gov't Ex. 1 at 27:36-27:58.)  The agents then asked Clark if he would sign the waiver if they agreed to talk about only the things that other people did.  (*Id.* at 28:13-28:32.)  Clark responded, "Nothing I can say to you man, I'm sorry."  (*Id.* at 28:39-28:41.)  Again, the agents asked him whether he wanted to answer their questions and reminded him that he could choose which questions to answer.  (*Id.* at 28:41-28:55.)  Clark responded, "I'm straight."  (*Id.* at 29:04.)  The agents apparently understood him to mean "no" but told him to respond "clearly in English."  (*Id.* at 29:08-29:13.)  Clark stated, "There ain't nothing to talk about.  I can't talk to you about.  . . . .  I guess that something I'll have to [inaudible] in

Court." (*Id.* at 29:13-29:22.)  One of the agents remarked, "That's your decision, but you don't seem very convinced about it."  (*Id.* at 29:23-29:27.)

At around the 36-minute mark, Clark said that "snitches" don't think about the consequences of what they do, but he does.  (Gov't Ex. 1 at 36:00-36:09.)  He acknowledged that he was concerned about possibly facing a life sentence and not seeing his children, but he stated, "I'm not going to do . . . whatever it is you want me to do to help you out in this case. I can't.  I can't."  (*Id.*at 36:15-36:37.)  Clark said, "I guess we'll just have to wait until we get in court," and "Sorry."  (*Id.* at 36:52-37:02.)

After some additional back-and-forth, the interview terminated about 40 minutes after it began, and Clark was taken out of the room.

### B.   Arguments

Clark argues that he was in custody for purposes of *Miranda* at the time of the interview at the Georgia Diagnostic and Classification Prison.  [Doc. 944 at 4-7.]  He acknowledges that SA Szabo advised him of his *Miranda* rights and that he understood his rights but maintains that that he did not explicitly or implicitly agree to waive his *Miranda* rights.  [*Id.* at 7-9.]  He thus argues that "anything [he] said during the interrogation was involuntary and was the product of a threat and/or promise by the Agents."  [*Id.* at 8-9.]  Specifically, he contends that any waiver of

his rights was coerced because he was told that "his way out of a life sentence is to talk"; that the agents would tell the prosecutor that Clark would had agreed to cooperate; and that if he talked, he would get to see his children again.  [*Id.*]  Clark further contends that the agents continued to "press and interrogate" him even though he twice invoked his right to remain silent:  first when he told the agents that "there is not anything he can help them out with, that there is nothing to talk about"; and second when he responded "no" to a question as to whether he wanted to help them.  [*Id.* at 9.]  Clark argues that any statements he made after either of those invocations should be suppressed.  [*Id.*]

Clark additionally argues the agents' conduct violated his Sixth Amendment right to counsel.  [Doc. 944 at 10-12.]  More specifically, at the time of the interview he was under indictment, so his right to counsel had attached; however, for the same reasons that he did not waive his *Miranda* rights, he did not waive his right to counsel either explicitly or implicitly.  [*Id.* at 11-12.]

In response, the government contends that Clark was not "in custody" for purposes of *Miranda*, even though he was in the state custody at the time of the interview.  [Doc. 972 at 4-7.]  Citing *Howes v. Fields*, 565 U.S. 499 (2012), the government states "physical presence in custody is not enough to constitute custody

for *Miranda* purposes"; rather, the inquiry is whether, based on the totality of the circumstances, a reasonable, innocent person would have felt free to terminate the interview and leave.  [*Id.* at 5-6.]  The government contends that the objective circumstances of the interview show that Clark was not in custody, including (1) the interview was conducted in a comfortable boardroom; (2) he remained handcuffed during the interview and prison guards remained outside the room pursuant to prison protocol; (3) the tone of the interview was conversational at all times; (4) Clark laughed several times during the interview; (5) Clark never asked to leave, even after the agents advised him of the federal charges and what they knew about his alleged involvement; (6) the agents told him on two occasions that he had the right to stop the interview at any time; (7) the interview lasted forty minutes and ended when Clark decided to see what would happen when he made his initial appearance in federal court the following week; and (8) the agents did not threaten him, display their weapons, or "use[] language that compelled Clark to speak.  [*Id.* at 6-7.]

The government further argues that even if Clark were in custody, his statements are admissible because he voluntarily waived his *Miranda* rights.  [Doc. 972 at 7-10.]  Clark, the government points out, was advised of his *Miranda* rights,

46

he was given a form so he could follow along, he stated that he understood his rights, and "there is no evidence that Clark was coerced in any way to waive his right to remain silent." [*Id.* at 8.] The government additionally contends that the agents did not threaten him, and the statements about his potential guideline sentence of life were true. [*Id.* at 8-9.] The government also points out that SA Szabo told Clark "I cannot make any promise" and that Clark, as a prisoner, knew that law enforcement officers probably lack the authority to affect the duration of a sentence. [*Id.* at 9.] The government also notes that Clark voluntarily offered some information and chose to protect other information, such as when he stated: "me being a Five that's a true statement, but there is just some stuff I cannot help you with." [*Id.*] Clark also knew that the interview was being recorded. [*Id.* at 9-10.]

Lastly, in response to Clark's contention that his Sixth Amendment right to counsel was violated, the government contends that since he waived his Fifth Amendment rights, he also waived his Sixth Amendment right. [Doc. 972 at 10.] In addition, at no time during the interview did Clark ask to speak with an attorney or suggest that he wanted counsel present. [*Id.* at 10-11.]

### C.  Analysis

#### 1.  Clark Was in Custody for *Miranda* Purposes

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, the Supreme Court created a presumption that evidence produced by custodial interrogation of a suspect is coerced unless the suspect is first advised of his constitutional right to remain silent and to have an attorney present during any questioning.  384 U.S. 436, 444-45 (1966).  "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."  *Howes*, 565 U.S. at 508-09.  In determining whether a person is in custody for purposes of *Miranda*, the court considers as a threshold matter whether, "in light to the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Id.* at 509 (citations and quotation marks omitted).  "[I]n order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation.'"  *Id.* (second alteration in original) (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994)).  "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or

48

absence of physical restraints during questioning, and the release of the interviewee at the end of the questioning." *Id.* (citations omitted).

If, under the first inquiry, the Court finds that the suspect's freedom of movement was curtailed, the Court next considers "the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509. This second inquiry is important because "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Id.* (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).

In *Howes*, the Supreme Court rejected the categorical rule that "a prisoner is always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison." *Howes*, 565 U.S. at 508. Rather, the Court explained, "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation," including the language used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. *Id.* at 514. In *Howes*, the circumstances of the defendant's interview had some of the hallmarks of a custodial interrogation, including that the defendant "was not advised that he

was free to decline to speak with the deputies," the "interview lasted for between five and seven hours," the deputies were armed, and one of the deputies "used a very sharp tone" and once used profanity. *Id.* at 515.  But those circumstances were offset by others.  "Most important" was that the deputies told the defendant at the beginning of the interview that he could leave and go back to his cell whenever he wanted and they reminded him of that during their encounter.  *Id.*  In addition, the defendant was not physically restrained or threatened, the interview room was a "well-lit, average-sized conference room," "the door to the conference room was sometimes left open," and the defendant "was offered food and water." *Id.*  Based on these circumstances, the Court found that a reasonable person would not have felt free to terminate the interview and leave.  *Id.*

The interview at issue here presents circumstances that are more restrictive than in *Howes.*  Significantly, the "most important" factor to the Supreme Court's analysis—that the suspect was told he could go back to his cell whenever he wanted—is absent here.  Although TFO Thompson testified at the hearing that all Clark had to do to return to his cell was "just . . . get up," [*see* Doc. 913 at 12], none of the agents actually told him that.  The government points out that SA Szabo told Clark at the outset of the interview that he could stop the interview at any time and

50

that he could answer only the questions he wished to answer. Under some circumstances such a statement might be sufficient to inform the suspect that he was free to terminate the interview and return to his cell at any time. But here, the agents did not completely honor that statement. For example, beginning at around 27 and a half minutes into the interview, SA Szabo and Clark had the following exchange:

> **SA Szabo**: Do you want to help yourself out of this a little bit?
>
> **Clark**:  I don't know.  If telling you something is a way to help myself out, I can't do that.
>
> **SA Szabo**:  Are you willing to answer our questions?
>
> **Clark**:  No, not if it's going to incriminate me.  That's what I'm saying.  I don't have anything to tell you.
>
> . . . .
>
> **SA Szabo**: How about this, if you sign that piece of paper [referring to the waiver of rights form] we talk about other people — we don't talk about you, we talk about other people?  How's that sound?  We don't worry about any of the things you did.  We just worry about other people.

(Gov't Ex. 1 at 27:36-28:33.)  Clark's statement that he was not willing to answer questions if they would incriminate him was tantamount to him requesting to stop the questioning.  By that point in the interview, the agents had told Clark several times that he was being charged with RICO, and as a result, he was implicated for

51

alleged actions of his co-conspirators.  As a result, the agents knew that Clark could (and likely would) incriminate himself even if he agreed only to answer questions about the activities of other alleged gang members.  Then, less than a minute later, SA Szabo told Clark that he would have to say "in English" what he wanted to do. Clark responded:  "There ain't nothing to talk about.  I can't talk to you about me. I guess that's just something I'll have to hear in Court."  (Gov't Ex. 1 at 29:13-29:22.)  SA Szabo then said:  "That's your decision.  But you don't seem very convinced about it."  (*Id*. at 29:23-29:26.)

Other factors also support a finding that the interview was custodial for *Miranda* purposes.  *Howes* instructs that the language used to summon an inmate to an interview is relevant, *see Howes*, 565 U.S. at 514; however, there is no evidence that Clark was told anything about the interview before arriving in the room with agents.  Here, Clark appears to have had no advance notice of the interview and did not know why he was meeting with the agents.  Also, unlike the interview in *Howes*, Clark met with three agents (rather than two), the door to the interview room was closed, and Clark remained restrained for the entirety of the

meeting.[8]  At the outset of the interview, he was given a copy of the superseding indictment in this case and he was told that he would be appearing in federal court the following week.  And though the agents did not tell Clark that he was under arrest, they did not tell him he was *not* under arrest.  They also told him that the previous day, law enforcement had conducted a round-up of other defendants named in the indictment, indicating that many of the codefendants had been taken into custody.  In addition, unlike in *Howes*, SA Szabo read Clark his *Miranda* rights, which "may be considered as some evidence by a reasonable person that he is in custody."  *Tukes v. Dugger*, 911 F.2d 508, 515 n.10 (11th Cir. 1990).

To be sure, some circumstances of the interview tend to support a finding that Clark was not in custody for *Miranda* purposes.  The room in which he was interviewed was relatively large and the agents' tone was generally conversational and relaxed.  The interview lasted just 40 minutes, far shorter than the five-to-seven-hour interview session in *Howes*, and shorter than other interviews that this Court has found to be non-custodial.  *See United States v. Winders*, No. 1:17-cr-

---

[8] The fact that Clark remained restrained does not weigh heavily in favor of a finding that the interview was custodial for purposes of *Miranda*, as Clark remained restrained pursuant to prison policy—but it is a factor the Court accords some weight.

313-ELR-AJB, 2018 WL 5779191, at 4 (N.D. Ga. Sept. 17, 2018) (finding that incarcerated suspect was not in custody for *Miranda* purposes where interview "was not too long in that it lasted two hours") (citing *United States v. Muegge*, 225 F.3d 1267 (11th Cir. 2000)), *report and recommendation adopted*, 2018 WL 5726197 (N.D. Ga. Nov. 1, 2018).   Clark was also not physically touched or threatened with physical harm at any point during the interview, and none of the agents displayed weapons at any time.   But based on the totality of the circumstances, the Court finds that a reasonable person in Clark's circumstances would not have felt at liberty to terminate the interview and leave, and that the interview environment presented "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."   *Howes*, 565 U.S. at 509. For these reasons, then, the Court finds that Clark was in custody for purposes of *Miranda* during the interview on October 17, 2017.

## 2. Clark Voluntarily, Knowingly, and Intelligently Waived his *Miranda* Rights

"[T]he accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement."   *Berhguis v.*

*Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369 (1979)).  This inquiry has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).   "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."  *Id.* (quotation omitted).  Ultimately, it must be shown by reference to the totality of the circumstances that the defendant's statement was "the product of an essentially free and unconstrained choice." *Parker v. Allen*, 565 F.3d 1258, 1280 (11th Cir. 2009) (quoting *Hubbard v. Haley*, 317 F.3d 1245, 1252-53 (11th Cir. 2003)).

The waiver of *Miranda* rights "can be established even absent formal or express statements of waiver."   *Berghuis*, 560 U.S. at 383; *see also Jones v. Dugger,* 928 F.2d 1020, 1027 (11th Cir. 1991) ("A refusal to sign a written waiver form does not conclusively indicate that the suspect wishes to remain silent.").  To establish an implied waiver of the right to remain silent, the government must show

that the *Miranda* warning was given, that the accused understood the warning, and that the accused made an uncoerced statement.  *Berghuis*, 560 U.S. at 384.

Here, the sufficiency of the *Miranda* warning and Clark's comprehension of his rights are not at issue.  [*See* Doc. 944 at 7 (stating that "it is undisputed from the transcript and the record[] that SA Szabo read *Miranda* rights to Tyrone Clark and that Mr. Clark understood his rights").]  "[F]rom this it follows that [Clark] knew what he gave up when he spoke."  *Berghuis*, 560 U.S. at 385.  "If [Clark] wanted to remain silent, he could have said nothing in response to [the agents'] questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation."  *Id.* at 386.  Thus, even though Clark did not explicitly state he was waiving his right to remain silent or sign the waiver-of-rights form, he continued to speak, impliedly waiving his rights.

The question is whether the agents coerced Clark into impliedly waiving his *Miranda* rights.  In many ways, the circumstances of the interview support the government's argument that Clark voluntarily waived his rights.  The agents did not threaten him with physical harm; they did not display their weapons or firearms; they maintained a casual tone of voice throughout the interview; the interview was conducted in a relatively large room; Clark and the agents were seated around a

56

conference table; and the interview lasted less than forty minutes.  *See Berghuis*, 560 U.S. at 386-87 (finding that defendant's statement toward the end of a three-hour interrogation was not coerced where there was no evidence that the police threatened or injured him during the interrogation or that he was fearful; the interrogation room was standard-sized; and the interview was conducted in the afternoon); *see also United States v. Bushay*, 859 F. Supp. 2d 1335, 1373 (N.D. Ga. 2012) ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession."), *report and recommendation adopted at id.* at 1353-54.

But the agents' statements were not perfect.   Most concerning is TFO Thompson's statement to Clark at around the eight-minute mark that his "the only way to help yourself out of life is to talk to us."  [Doc. 944 at 8.]  In its response, the government asserts that the statement is not coercive because "statements about [Clark's] potential guideline sentence of life [were] true."  [Doc. 972 at 9.]  The government misses the point.  This is not a case where the police simply told the suspect what the possible penalties would be—information that is usually insufficient to be coercive.  *See United States v. Nash*, 910 F.2d 749, 753 (11th

Cir.1990) ("[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government." (alterations in original) (quotation omitted)).   TFO Thompson instead stated that cooperating would be the "only way" that he could avoid a life sentence.  Offer Thompson's insinuation that unless Clark cooperated he would face a life sentence is a misstatement of the law, and it comes dangerously close to undermining the *Miranda* warning that SA Szabo gave just three minutes earlier.  As the Eleventh Circuit has explained:  "While misrepresentations of fact are not enough to render a suspect's subsequent confession involuntary or to undermine a suspect's Miranda waiver, misrepresentations of law are more likely to render a confession involuntary."  *United States v. Becker*, 762 F. App'x 668, 673 (11th Cir. 2019); *see also United States v. Spinks*, No. 1:16-CR-015-14-AT-JSA, 2016 WL 7383341, at *4 (N.D. Ga. Sept. 28, 2016) ("Generally, a waiver resulting from an officers' misleading advice of law that is inconsistent with the protections of *Miranda* cannot be said to have been knowingly, voluntarily and intelligently made."), *report and recommendation adopted*, 2016 WL 7385716 (N.D. Ga. Dec. 19, 2016).

Nevertheless, considering the totality of the circumstances, the Court is not persuaded that TFO Thompson's statement was sufficiently coercive in this case to overbear Clark's will and render Clark's waiver involuntary.  TFO Thompson did not contradict the *Miranda* warning that statements that the accused makes may be used against him, as he did not promise or state that speaking with law enforcement would actually lead to a reduced sentence.  *See United States v. Jacques*, 744 F.3d 804, 810 (1st Cir. 2014) (noting that "federal courts considering the totality of the evidence have repeatedly found that an interrogator's threats of a harsher prison sentence if a defendant failed to cooperate did not suffice to overbear the defendant's will").  Plus, Clark did not make a potentially incriminating statement for nearly two minutes after TFO Thompson spoke, and, based on the Court's review of the audio recording, it does not sound as if Clark was speaking against his will.  Specifically, Clark said:

> I know that Monto got his toe shot; I didn't know he shot his own toe.  See, y'all know what up more than I do.  You know, me being the five that's a true statement, but there's some stuff that I can't help you with I don't know . . . I don't know everything.

(Gov't Ex 1. at 10:06-10:20.)   The Court cannot agree that Clark made this statement because he thought, by doing so, he could avoid a life sentence.  Rather, this statement was made immediately after the agents were giving Clark examples

of things they learned during the investigation, and the Court interprets Clark as trying to explain that the agents knew far more than he did, and that whatever information he had was already known to law enforcement. Thus, it cannot reasonably be said that Clark's statement was the result of TFO Thompson's statement about avoiding a life sentence.

Clark's argument that the agents' conduct was coercive because they told him that "if he talked, he would get to see his children again" is somewhat overstated. [*See* Doc 944 at 8.] The agents actually did not make such a statement. Immediately after TFO Thompson insinuated that Clark could avoid a life sentence by cooperating, SA Cleary asked Clark whether his youngest child had turned a year-and-a-half yet. (Gov't Ex. 1 at 8:43-8:56.) And after Clark confirmed that his child had just turned sixteen months, SA Cleary stated, "Just something to think about." (*Id.* at 9:09.) Such a statement is not sufficiently coercive under these circumstances. But even so, as just explained, Clark's purportedly incriminating statement was not made out of a belief that speaking would somehow allow him to see his children; rather, it was Clark's attempt to explain to the agents that they knew more than he did, so there was nothing more he could add.

The Court is also persuaded that the TFO Thompson's statement about avoiding a life sentence and SA Cleary's reference to Clark's children did not compel him to waive his right to remain silent because, near the end of the interview, Clark acknowledged that he was concerned about possibly facing a life sentence and not being able to see his children.  But despite those concerns he told the agents:  "I'm not going to do . . . whatever it is you want me to do to help you out in this case. I can't.  I can't."  (Gov't Ex. 1 at 36:30-36:37.)  About fifteen seconds later he added:  "I guess we'll just have to wait until we get in court."  (*Id.* at 36:52-36:53.)  Shortly after that, the interview ended.  Clark's statement it shows that despite facing a possible life sentence and despite potentially being unable to see his children, he would not cooperate, which strongly shows that what the agents told him during the interview did not overbear his will.

Lastly, Clark's contention that he was coerced to waive his *Miranda* rights and incriminate himself because the agents said that they would tell the prosecutor that he agreed to cooperate is without merit.   "A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient

inducement so as to render a subsequent incriminating statement involuntary." *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985).

In sum, considering the totality of the circumstances, the Court finds that the government has satisfied its burden to show that Clark made an uncoerced choice to speak to the agents and that he had the requisite level of comprehension such that his decision was knowing and intelligent.

### 3.     Clark's Sixth Amendment Right to Counsel Was Not Violated.

Clark also argues that his statements during the interview should be suppressed because the agents did not obtain a valid waiver of his Sixth Amendment right to counsel.  [Doc. 944 at 10-12.]  The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  The right to counsel attaches when a prosecution is commenced by the initiation of adversary judicial criminal proceedings, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."  *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (quotation omitted); *accord United States v. Dixon*, 901 F.3d 1322, 1340 (11th Cir. 2018), *cert. denied sub nom. Portela v. United States*, No. 18-6917, 2019 WL 113506 (U.S. Jan. 7, 2019).  The superseding indictment

62

charging Clark was returned on October 12, 2017; thus, Clark had a constitutional right to counsel at the time of the interview.  *See Montejo v. Louisiana*, 556 U.S. 787, 786 (2009).

It is "beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent."  *Montejo*, 556 U.S. at 786 (citing *Patterson v. Illinois*, 487 U.S. 285, 292 n.4 (1988); *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  Critically a "defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled."  *Id*.  Typically, the waiver of the Sixth Amendment right to counsel is sufficient if the "defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights . . . even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment[.]"  *Id.*; *see also Patterson*, 487 U.S. at 296 (stating that, in general, "an accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one" (citation omitted)).  But

63

"once a defendant clearly invokes his right to counsel, authorities may not interrogate him (1) until counsel is made available, or (2) unless the defendant initiates the contact; any waiver obtained prior to the occurrence of at least one of those events is invalid." *United States v. Rojas*, 553 F. App'x 891, 893 (11th Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 485-87 (1981)); *see also Edwards*, 451 U.S. at 486 ("[I]t is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.")).

Clark asserts that since he had been indicted, and the right to counsel had attached, "greater caution should have been taken when seeking a waiver and a statement from [him]." [Doc. 944 at 11.] The Court is not aware of any authority supporting this assertion, nor is it really clear what "greater caution" Clark contends the agents should have used. Moreover, as discussed, it is undisputed that Clark was advised of his right to counsel and understood his rights, and that he voluntarily spoke with the agents. So, for the same reasons that the Court finds that Clark impliedly waived his right to remain silent, Clark knowingly and voluntarily waived his right to counsel.

### 4.    Clark Invoked His Right to Remain Silent Approximately 28 Minutes into the Interview

Having concluded that Clark's voluntarily and knowingly waived his *Miranda* rights, the question next is whether Clark invoked his right to remain silent during the interview.  Clark asserts that he invoked his right to remain silent on two occasions, which the agents ignored.  The first occurred around 10 minutes and 15 seconds into the interview, when Clark stated "there is not anything he can help them out with, that there is nothing to talk about."  [Doc. 944 at 9.]  The second occurred at around 27 minutes and 47 seconds, where the agents asked Clark if he wants to talk to them, and he replied "no."  [*Id.*]  The government does not respond to this argument.

"Law enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous."  *Medina v. Singletary*, 59 F.3d 1095, 1100-01 (11th Cir. 1995) (citing *Davis v. United States*, 512 U.S. 452 (1994)); *see also Berghuis*, 560 U.S. at 381-82 (holding that suspect who wants to invoke his or her right to remain silent must do so unambiguously). "The inquiry as to whether a suspect's invocation of his right to remain silent was ambiguous or equivocal is an objective one."  *Medina*, 59 F.3d at 1101. "A suspect must articulate his desire to cut off questioning with sufficient clarity that a

65

reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Id.* (quotation omitted).

The first of those two instances in which Clark purportedly invoked his right to remain silent is too ambiguous to qualify as an assertion of the right to remain silent. Viewed in context, Clark was not expressing a desire to refuse to answer; rather, he was expressing his belief that he did not know anything that the agents did not already know through their investigation. It was not, therefore, a clear and unambiguous invocation of his right to remain silent.

The second statement is a closer call. In response to SA Szabo's question as to whether Clark was willing to answer the agents' questions, Clark responded: "No, not if it's going to incriminate me. That's what I'm saying. I don't have anything to tell you." (Gov't Ex. 1 at 27:52-27:58.) This statement is clearer than the first—not only does Clark say "no," he also explains that the reason he does not wish to answer questions is that he does not wish to incriminate himself. At that point, the questioning should have ceased, as a reasonable officer would, under these circumstances, have understood that Clark was invoking his right to remain silent. SA Szabo's follow-up statement to Clark offering to limit agents' questions to what other people did, rather than Clark's actions, is a pig in a poke. By offering

66

to limit questions to actions of other individuals, SA Szabo implies that Clark could avoid incriminating himself.  But Clark was charged with RICO conspiracy and, as such, Clark faced criminal responsibility not just for activities he participated in, but also for the actions of his coconspirators.   Thus, the offer to cabin the interrogation to actions that others engaged in would not insulate Clark from incriminating himself; to the contrary, it was likely that if Clark answered questions about alleged criminal activities of others he would incriminate himself.  Clark was sufficiently clear: he did not want to speak because he did not want to incriminate himself.  As a result, any statements that Clark made after Clark invoked his right to stop answering questions out of fear of self-incrimination about 28 minutes into the interview should be suppressed.

### D.     Summary

For the foregoing reasons, the Court concludes that Clark was in custody for purposes of *Miranda* but voluntarily, knowingly, and intelligently waived his *Miranda* rights and Sixth Amendment right to counsel.  At around 28 minutes into the interview, however, he invoked his right to remain silent and questioning should have ceased.  Thus, any statements made after that point should be suppressed.

Accordingly, it is **RECOMMENDED** that the motion to suppress statements [Doc. 839] be **GRANTED IN PART AND DENIED IN PART**.

## V.   CONCLUSION

For the foregoing reasons, it is **ORDERED** that Clark's motion for a bill of particulars [Doc. 600] be **DENIED**, and it is **RECOMMEND** that Clark's motion to suppress evidence seized in connection with the traffic stop [Doc. 597] be **GRANTED IN PART AND DENIED IN PART** and Clark's motion to suppress statements [Doc. 839] be **GRANTED IN PART AND DENIED IN PART.**

I have now addressed all referred pretrial matters relating to Defendant Clark and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL** as to this defendant.[9]

IT IS SO ORDERED AND RECOMMENDED this 1st day of August 2019.

_____
JOHN K. LARKINS III
United States Magistrate Judge

_____

[9] Since matters pertaining to Clark's codefendants still are pending, the District Court is not required to place his case on the trial calendar at this time.  18 U.S.C. § 3161(h)(6).

68